# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:22-CR-0361 |
| v. | (Chief Judge Brann) |
| DANIEL J. PICCA, | |
| Defendant. | |

## MEMORANDUM OPINION

### DECEMBER 30, 2025

Defendant Daniel J. Picca was indicted by a federal grand jury on October 12, 2022, for one count of using interstate facilities to transmit information about a minor in violation of 18 U.S.C. § 2425.[1] After pleading not guilty,[2] Picca was released on conditions imposed pursuant to 18 U.S.C. § 3142(c)(1)(B), which was enacted as part of the Adam Walsh Child Protection Safety Act.[3] He remains on pretrial release subject to those conditions. A grand jury returned a superseding indictment on March 14, 2024, adding counts of receipt and possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (4). Currently pending before the Court are Picca's motions to dismiss the indictment, to suppress evidence, and to modify the conditions of release. For the following reasons, the motions to dismiss and suppress are denied, and the motion to modify is granted.

---

[1]   Doc. 1 (Indictment).
[2]   Doc. 10.
[3]   Pub. L. No. 109-248 (2006).

## I.    BACKGROUND

Federal Agents were investigating Mr. Picca in 2018 for child-pornography-related offenses based on his operation of the website and Instagram account "Swole Inc."[4] In the search warrant affidavit, authored by FBI Special Agent Christian Reite, Picca's ownership of Swole Inc. was established by evidence showing that he had solicited a graphic designer in 2015 to create the website and a series of suspicious PayPal transactions dating from April 1, 2007, to March 29, 2018, originating from accounts clearly associated with Picca.[5]

According to the graphic designer, who was interviewed in May of 2017, Swole Inc. promoted images of young male models, some of whom appeared to be under 18, and hosted private live-streams (called "flex shows") featuring these young men "acting in a sexually suggestive manner, if not outright committing specific sexual acts for money."[6] Online forum posts from March 29, 2017, through January 13, 2018, also suggested that Swole Inc. featured models under the age of 18 who sometimes appeared nude in livestream shows.[7] Furthermore, an internet sleuth published a video on August 19, 2017, in which he purported to interview a former Swole Inc. model who stated that he had performed nude for "unnamed

---

[4]    Doc. 69-3 (Warrant) ¶ 9.
[5]    *Id.* ¶¶ 9-12 (describing transactions from accounts registered to "Daniel Picca" with his birthdate, address, phone number, and email addresses including "djp@swoleinc.com").
[6]    *Id.* ¶¶ 10-11.
[7]    *Id.* ¶ 14.

sponsors" when he was a minor.[8] Finally, the FBI directly interviewed another former model who stated that he had exposed his penis in flex shows coordinated through Swole Inc. on at least two occasions as a minor between 2015 and 2018 (when he was interviewed).[9] The affidavit includes statements from these witnesses suggesting Picca's knowledge and encouragement of the sexual displays.[10]

In addition to information about Swole Inc., the warrant affidavit also included historical information about Picca's past conduct which resulted in inquiries and investigations into whether he was engaged in possessing or producing child pornography or, for lack of a better term, pedophilia. Specifically, the affidavit noted that Picca was terminated as a teacher in the Montgomery County, Maryland public school system following a state ALJ's findings that: (1) from 1993 until at least 2010, Picca had inappropriate physical contact with and took shirtless photos of male elementary school students; (2) in 1996 a state ALJ found Picca responsible for indicated child abuse; and (3) detailing several specific instances of unsupervised or improper physical contact with young students.[11] The affidavit also described a Pennsylvania State University Police report that an anonymous source had accused

---

[8]   *Id.* ¶ 15. The FBI's investigation confirmed that this individual had been in regular contact with Picca between December 26, 2016, and July 2, 2017. *Id.* ¶ 17.

[9]   *Id.* ¶ 16.

[10]  *See id.* ¶ 15 (witness in online video stating that Picca "encouraged [him] to do other things," and had "asked him to take off his underwear").

[11]  *Id.* ¶ 7.

Picca of posing as a Penn-State-affiliated recruiter to solicit adolescent males to send him suggestive images.[12]

The warrant affidavit contains significant information linking Picca to the location to be searched (his home) and providing evidence showing that internet-capable devices connected to Picca and Swole Inc. would be present at that location.[13] Accordingly, Special Agent Reite requested that the warrant permit him to access Picca's devices and to seize electronic storage media or copy electronically stored information.[14] United States Magistrate Judge William I. Arbuckle approved the warrant on October 2, 2018.[15] The warrant was executed on October 10, 2018, and law enforcement seized computers, cellphones, and personal items.[16] Law enforcement retained several of Picca's electronic devices for years.[17]

A federal grand jury returned Picca's indictment on October 12, 2022, four years after the search was executed.[18] According to Picca, on October 21, 2022, police misled him into believing that he needed to report to a police station because he was the victim of a financial crime, and then arrested him without warning.[19] At

---

[12]    *Id.* ¶ 8.
[13]    *Id.* ¶¶ 18-23 (describing the house and connecting IP addresses of devices accessing accounts also associated with Swole Inc. to Picca's internet subscription); *id.* ¶¶ 12, 22 (stating that the suspicious PayPal account registered to Picca's email addresses was accessed from his home's IP address (73.130.226.240)).
[14]    *Id.* ¶¶ 36-37, 39.
[15]    *Id.* at 35.
[16]    Doc. 68 (Suppression Brief) at 2.
[17]    *Id.*
[18]    Doc. 1.
[19]    Doc. 66 (Dismissal Brief) at 3.

Picca's arraignment, Magistrate Judge Arbuckle imposed conditions of release including a condition of electronic location monitoring, travel restrictions, no-contact with victims, reporting to pretrial services, home detention, and weapons restrictions as required under 18 U.S.C. § 3142(c)(1)(B).[20] After Picca's arrest, he claims that Special Agent Reite sought his cooperation.[21] But, Picca claims, when he refused to admit wrongdoing, Reite repeatedly threatened him with additional charges.[22] Picca maintained his innocence, and negotiations fell apart.[23] On March 14, 2024, a superseding indictment was filed adding counts for receipt and possession of child pornography.[24]

## II.    ANALYSIS

Picca has filed three motions: (A) to dismiss the indictment; (B) to suppress evidence; and (C) to modify the conditions of his pretrial release.

### A.    Motion to Dismiss

Picca asserts two grounds for dismissal of the indictment: (1) unreasonable pre-indictment delay; and (2) vindictive prosecution. Neither contention has merit.

---

[20]   Doc. 11 (Release Order).
[21]   Doc. 66 at 3.
[22]   *Id.*
[23]   *Id.* at 3-4.
[24]   Doc. 35 (Superseding Indictment).

### 1.    Pre-Indictment Delay

A defendant may challenge his prosecution for a delay between the crime and indictment pursuant to the Due Process Clause.[25] To succeed on such a motion, the defendant must "show both (1) that the delay between the crime and the federal indictment actually prejudiced his defense; and (2) that the government deliberately delayed bringing the indictment in order to obtain an improper tactical advantage or to harass him."[26]

"Proof of prejudice is generally a necessary but not sufficient element of a due process claim . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."[27] Examples of prejudice caused by delay include the loss of witnesses or evidence, or the fading of memories.[28] Moreover, the defendant's examples of prejudice must be concrete: "[t]he mere possibility of prejudice inherent in any extended delay, or the mere possibility that a witness might become inaccessible and evidence be lost, is not sufficient."[29]

---

[25]   *United States v. Beckett*, 208 F.3d 140, 150-51 (3d Cir. 2000); *see United States v. Marion*, 404 U.S. 307, 324 (1971).

[26]   *Beckett*, 208 F.3d at 150-51 (citing *United States v. Lovasco*, 431 U.S. 783, 789-90 (1977)).

[27]   *Lovasco*, 431 U.S. at 790 (citing *Marion*, 404 U.S. at 322); *United States v. Sebetich*, 776 F.2d 412, 430 (3d Cir. 1985) ("Appellants must show intentional delay *and* actual prejudice. Because they clearly failed to show intentional delay, we need not reach the question whether appellants have met the burden of showing actual prejudice." (emphasis in original)); *United States v. Wong*, No. 3:24-CR-0139, 2024 WL 2832913, at *6 (M.D. Pa. June 4, 2024).

[28]   *United States v. Ismaili*, 828 F.2d 153, 168 (3d Cir. 1987); *see Beckett*, 208 F.3d at 151 (citing *Marion*, 404 U.S. at 325-26).

[29]   *Ismaili*, 828 F.2d at 168 (citing *Marion*, 404 U.S. at 315).

The Supreme Court has spoken clearly in explaining that investigative delay is distinguishable from tactical delay, and that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."[30] "Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."[31] So unless he can show that "the federal government delayed the indictment deliberately to harass him or to gain some improper advantage," a defendant's undue delay claim will fail.[32]

Picca does not establish either of the *United States v. Beckett* elements. First, he does not show any concrete prejudice which has resulted from the pre-indictment delay. He states that "at least one known witness in the investigation from South Carolina is deceased [and] [t]he lead investigator, Agent Reite, has retired from the FBI."[33] Without any indication about the deceased potential witness's testimony, however, the Court cannot make a determination about the prejudice that loss has caused.[34] Indeed, at the October 21, 2025 suppression hearing, defense counsel

---

[30] *Lovasco*, 431 U.S. at 795.
[31] *Id.*
[32] *Beckett*, 208 F.3d at 151.
[33] Doc. 66 at 8.
[34] *See Ismaili*, 828 F.2d at 168-69 (holding that the deaths of two potential witnesses did not establish prejudice) (citing *Lovasco*, 431 U.S. at 789 (same)); *United States v. U.S. Gypsum*

conceded that the deceased witnesses "weren't of strong relevance in this case."[35] And Agent Reite remains ready, willing, and able to testify at Picca's trial; indeed, he appeared at the suppression hearing.

Picca's main focus on the prejudice issue is on the deprivation of his property, "the indignity and inconvenience" of the search and his detention during it, the negative impact the investigation had on "[h]is standing and reputation in the State College community," the financial hardship of hiring counsel, and the "hypertension and anxiety [he suffered] as a result of this investigation."[36] This is not the type of prejudice that is cognizable on a pre-indictment delay challenge. The section of *United States v. Marion* Picca cites for support was *contrasting* these factors—which follow from a delay after "arrest and holding to answer a criminal charge"—against the consequences of a delay in "the period prior to arrest," during which "a citizen suffers no restraints on his liberty and is not the subject of public accusation."[37] In the Supreme Court's words, these "situation[s] do[] not compare."[38] Moreover, none

---

*Co.*, 550 F.2d 115, 119-20 (3d Cir. 1977) (same); *United States v. Dukow*, 453 F.2d 1328, 1330-31 (3d Cir. 1972) (same).

[35] Doc. 93 (Hrg. Tr.) at 9:9-19.

[36] Doc. 66 at 7-8.

[37] *Marion*, 404 U.S. at 321. *Marion* specifically held that the Sixth Amendment right to a Speedy Trial does not apply to pre-arrest delay, and these factors are only relevant to Speedy Trial claims. The other authority Picca cites, *United States v. Ewell*, 383 U.S. 116 (1966) and *Klopfer v. State of North Carolina*, 386 U.S. 213 (1967), are both Speedy Trial cases that *Marion* expressly distinguished as inapplicable to the pre-arrest period.

[38] *Id.*

of these negative consequences is relevant to whether "the pre-indictment delay in this case caused substantial prejudice to appellees' *rights to a fair trial*."[39]

Even if the search and investigation had negative consequences for Picca, they did not prejudice his ability to put on his defense, which is the only issue addressed by the Due Process clause.[40] So Picca has not carried his burden of showing prejudice, and his motion to dismiss for undue delay fails.

Even if he had shown prejudice, Picca has not demonstrated that the Government delayed to gain a tactical advantage. He offers no specific benefit the Government reaped from the delay.[41] In response, the Government explains that it was attempting to access Picca's cell phone during this period, but that it had difficulty overcoming his password protection.[42] It contends that, while it did have evidence that Picca had committed the originally charged offense, investigators

---

[39]   *Id.* at 324 (emphasis added); *Beckett*, 208 F.3d at 150-51 (defendant must show "that the delay between the crime and the federal indictment actually prejudiced *his defense*" (emphasis added)).

[40]   I additionally note that a number of the supposed examples of prejudice caused by the delay are not really delay-related at all, and are instead merely gripes about being investigated. For example, the "indignity and inconvenience" of the search and attendant detention were limited to that hour-and-a-half long event. Doc. 66 at 7. Picca's "banish[ment] from the campus of Penn State University" followed from the *investigation alone*—not its length, barring some very strange reasoning from Penn State that the passage of time without charges after a search somehow increases the likelihood that the subject of the search committed the suspected crime—and the same goes for his "hypertension and anxiety," which cannot have been exacerbated during the time of the delay when "he believed . . . the investigation had long been resolved." *See* Doc. 66 at 7-8.

[41]   Doc. 66 at 8.

[42]   *See* Doc. 83.

believed that the phone would contain evidence of more severe offenses.[43] At the suppression hearing, Agent Reite also explained the difficulties of investigating Swole Inc., given its nationwide scope.[44] Picca does not offer any argument that this explanation is contrived. Accordingly, he has not shown an improper purpose by the Government, and his motion to dismiss fails for this additional reason.

The Court also disagrees with Picca that Federal Rule of Criminal Procedure 48(b)(1) offers a ground for dismissal here. Although that Rule permits the Court to dismiss an indictment "if unnecessary delay occurs in . . . presenting a charge to a grand jury," the Rule is "clearly limited to post arrest situations."[45] In contrast, pre-indictment delays where the defendant has not been federally arrested are the sole province of the Due Process clause.[46]

### 2.    Vindictive Prosecution

Although the Government has broad discretion to make decisions about whom to prosecute,[47] it may not prosecute individuals for "reasons forbidden by the Constitution."[48] One forbidden reason is prosecuting an individual for "exercising a protected statutory or constitutional right," colloquially referred to as a "vindictive

---

[43] *See Beckett*, 208 F.3d at 151 ("We see no evidence of improper delay while the federal government was building its case against Beckett regarding the robbery of the Home Unity Bank, an armed robbery not charged by the state authorities.").

[44] *See generally* Doc. 93 at 22:14-34:16.

[45] *United States v. Clark*, 398 F. Supp. 341, 349 (E.D. Pa. 1975) (citing *Marion*, 404 U.S. at 319).

[46] *Id.* at 350.

[47] *United States v. Biden*, 729 F. Supp. 3d 410, 416 (D. Del. 2024) (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

[48] *Id.* at 417 (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)).

prosecution."[49] The Defendant bears the burden of proving vindictive prosecution.[50] In *United States v. Paramo*, the United States Court of Appeals for the Third Circuit reiterated that there are two paths available to a defendant to meet this burden. First, the defendant can prove "actual vindictiveness" "us[ing] evidence of a prosecutor's retaliatory motive."[51] "Second, in certain circumstances, a defendant may show facts sufficient to give rise to a presumption of vindictiveness."[52]

Picca fails to start down either of these paths. He contends that "the superseding indictment was brought solely to punish [him] for his refusal to admit his guilt and assist the Government in building up their case against him."[53] In other words, he contends that the Government used the threat of additional charges as a negotiating tactic to get him to plead guilty and, when he refused to do so, imposed the additional charges. But in *Bordenkircher v. Hayes*, the Supreme Court considered and rejected just such a challenge.[54]

In *Bordenkircher*, the defendant, Paul Lewis Hayes, was indicted on a charge carrying 2-10 years in prison.[55] During plea negotiations, the prosecutor offered the carrot of a sentencing recommendation of 5 years in return for a plea of guilty, and

---

[49]  *Id.* (quoting *United States v. Goodwin*, 457 U.S. 368, 372 (1982)).
[50]  *Id.* (quoting *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993)).
[51]  *Id.* (quoting *Paramo*, 998 F.2d at 1220).
[52]  *Id.* (quoting *Paramo*, 998 F.2d at 1220).
[53]  Doc. 66 at 10.
[54]  434 U.S. 357 (1978).
[55]  *Id.* at 358.

threatened the stick of an additional indictment under a statute carrying a *mandatory sentence of life imprisonment* if the plea was rejected.[56] When Hayes rejected the plea, the prosecutor sought and obtained the new indictment.[57] As the Supreme Court succinctly explained: "It is not disputed that the recidivist charge was fully justified by the evidence, that the prosecutor was in possession of this evidence at the time of the original indictment, and that Hayes' refusal to plead guilty to the original charge was what led to his indictment under the habitual criminal statute."[58] Hayes was convicted of both charges and sentenced to life imprisonment.[59]

The Supreme Court held that the Government's ultimatum did not violate due process. Recognizing "the 'give-and-take' of plea bargaining," the Supreme Court held that offering not to pursue more serious charges in return for a guilty plea carries "no . . . element of punishment or retaliation."[60] It concluded that "[w]hile confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'"[61]

---

[56] *Id.* at 358-59.
[57] *Id.* at 359.
[58] *Id.*
[59] *Id.*
[60] *Id.* at 363.
[61] *Id.* at 364 (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973)).

There is no relevant factual distinction between *Bordenkircher* and this case. In both, the facts supporting the additional charges were available at the time of the initial indictment.[62] In both, the Government directly threatened to add the charges if a guilty plea was not reached.[63] And in both, the defendant refused to admit guilt and new charges were filed.[64] Picca tries to avoid this result by casting the new charges as a response to his "refusal to incriminate himself" instead of "failed plea negotiations."[65] This semantic trick falls flat. Picca's "refusal to incriminate himself" is equivalent to a rejection of a guilty plea, in which a defendant must necessarily incriminate himself by admitting his guilt.[66] Accordingly, *Bordenkircher* controls, and Picca's motion to dismiss for vindictive prosecution is denied.

### B. Motion to Suppress

Picca's motion to suppress raises five issues; four dealing with the warrant and one with the search of seized items. He contends that evidence recovered in the

---

[62] Doc. 66 at 11 ("[T]here were no new facts supporting the two new accounts that were discovered in the period between indictments . . . . The Government could have filed the same charges in the initial indictment."); *Bordenkircher*, 434 U.S. at 359.

[63] Doc. 66 at 10-11 (noting that Agent Reite required Picca to be truthful and "admit[] . . . personal wrongdoing" or face "additional and more serious charges"); *Bordenkircher*, 434 U.S. at 359.

[64] Doc. 66 at 11 ("It was only after Mr. Picca steadfastly maintained his innocence and refused to further cooperate that the Government obtained a second indictment with additional charges to punished Mr. Picca. . . ."); *Bordenkircher*, 434 U.S. at 359.

[65] Doc. 66 at 11 n.3.

[66] There is also no relevant difference between plea and cooperation negotiations. Cooperation agreements are usually antecedent to a guilty plea (or immunity or dropped charges without a recognition of factual innocence). A defendant who steadfastly maintains his innocence necessarily rejects the possibility of any deal with the government, and his refusal to make any concessions does not transmute the Government's valid efforts to bargain using the chips that it held (i.e. evidence already in its possession) into a vindictive prosecution.

search of his home must suppressed because: (1) the warrant application does not establish probable cause of an offense; (2) the warrant application does not establish probable cause that evidence will be found at Picca's home; (3) the warrant was overbroad; and (4) omissions in the warrant application rendered it inaccurate and undermined probable cause. The Government opposes each issue and (5) argues that the good faith exception applies in any event. Picca also argues (6) that the Government took too long to search his devices after executing the warrant.

### 1.    Probable Cause of an Offense

"To obtain a search warrant, the government must present probable cause that evidence of criminal activity will be found in the place to be searched."[67] The first part of this inquiry requires the affiant to provide sufficient evidence to establish probable cause to believe that a crime has been committed.[68] Because Picca challenges the facial sufficiency of probable cause in the warrant, my job "is not to decide probable cause *de novo*, but to determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'"[69] In doing so, I must pay deference to the fact that "[i]t is distinctly the magistrate's task to make the 'practical, common-sense decision whether, given all the circumstances set forth in

---

[67] *United States v. Alexander*, 54 F.4th 162, 171 (3d Cir. 2022) (citing *Smith v. Ohio*, 494 U.S. 541, 542 (1990)).

[68] *See United States v. Miah*, 444 F. Supp. 996, 999-1000 (E.D. Pa. 1977) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)); *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) (referring to this as the "commission element").

[69] *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[70] Thus, "[i]f a substantial basis exists to support the magistrate's probable cause finding, [I] must uphold that finding even if a 'different magistrate judge might have found the affidavit insufficient to support a warrant.'"[71]

Although he does not cite any authority for the relevant proposition, Picca's primary argument on this issue is that the information in the affidavit described "historically dated non-criminal behavior."[72] "Age of the information supporting a warrant application is a factor in determining probable cause."[73] "If too old, the information is stale and probable cause may no longer exist."[74] Staleness is evaluated not solely based on the time "between the facts relied on and the issuance of the warrant," but also "the nature of the crime and the type of evidence."[75]

Much of the evidence in the warrant is not stale. With respect to child pornography offenses "accomplished through the use of a computer," the Third Circuit has advised that relevant "information . . . has a relatively long shelf life. It

---

[70] *United States v. Williams*, 974 F.3d 320, 350-51 (3d Cir. 2020) (quoting *Gates*, 462 U.S. at 238).

[71] *Stearn*, 597 F.3d at 554 (quoting *United States v. Conley*, 4 F.3d 1200, 1205 (1993)).

[72] Doc. 68 at 8.

[73] *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (citing *United States v. Forsythe*, 560 F.2d 1127, 1132 & n.6 (3d Cir. 1977)).

[74] *Id.* (citing *United States v. McNeese*, 901 F.2d 585, 596 (7th Cir. 1990)).

[75] *Id.* (quoting *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990) and citing *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983)).

has not been, and should not be, quickly deemed stale."[76] This guidance is synthesized from two factors: (1) "persons with an interest in child pornography tend to hoard their materials and retain them for a long time"[77]; and (2) "computers have 'long memor[ies]' . . . [i]mages stored on computers can be retained almost indefinitely, and forensic examiners can often uncover evidence of possession or attempted possession long after the crime has been completed."[78] Moreover, because the Court must consider "the nature of the crime,"[79] "where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance."[80]

Here, evidence suggested that Picca was continuously using Swole Inc. to facilitate the digital transmission of sexually explicit conduct involving minors at least until approximately eight months before the warrant application. Authorities

---

[76] *United States v. Vosburgh*, 602 F.3d 512, 529 (3d Cir. 2010) (citing *United States v. Shields*, 458 F.3d 269, 279 n.7 (3d Cir. 2006)).

[77] *Id.* at 528 (citing *Shields*, 458 F.3d at 279 n.7)

[78] *Id.* at 529 (quoting *United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006) (en banc)); *United States v. Caesar*, 2 F.4th 160, 175-76 (3d Cir. 2021); *see United States v. Kvashuk*, 29 F.4th 1077, 1087 (9th Cir. 2022) (denying staleness challenge to 15–20-month-old evidence stored on computer); *United States v. Seiver*, 692 F.3d 774, 775-78 (7th Cir. 2012) (Posner, J.) (arguing that staleness of digital evidence should be grounded solely in computer data retention considerations, rather than tendencies of specific defendants).

[79] *Harvey*, 2 F.3d at 1322.

[80] *United States v. Costa*, 736 F. Supp. 2d 859, 863 (D. Del. 2010) (quoting *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005)); *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 148 (3d Cir. 2002).

interviewed a potential minor victim ("MV2") who confirmed that he had messaged with Picca and been encouraged to stream flex shows in 2015.[81] On at least two occasions, MV2 exposed his penis in flex shows.[82] The FBI also interviewed a graphic designer who Picca solicited to design a website for Swole Inc. in 2015.[83] In his interview, he explained that he believed that the website's private show function was intended to facilitate live streams of "young male models acting in a sexually suggestive manner, if not outright committing specific sexual acts for money."[84]

The affidavit also included a significant quantity of hearsay evidence consistently indicating that Picca was involved in coordinating flex shows featuring minor boys posing nude until shortly before the warrant affidavit.[85] Agent Reite described a publicly available interview of another potential minor victim ("MV1") in which he stated that Picca observed private shows organized through Swole Inc., and explained that viewers had asked him on multiple occasions "to remove his underwear."[86] MV1 also specifically stated that Picca had asked him to expose his genitals, and that he knew other minor models had done naked shows for Picca.[87]

---

[81] Doc. 69-3 ¶ 16.

[82] *Id.*

[83] *Id.* ¶ 9.

[84] *Id.* ¶ 10.

[85] *See Rugendorf v. United States*, 376 U.S. 528, 533 (1964) ("[H]earsay may be the basis for a warrant . . . so long as there was a substantial basis for crediting the hearsay." (quoting *Jones v. United States*, 362 U.S. 257, 271-72 (1960))).

[86] Doc. 69-3 ¶ 15.

[87] *Id.*

MV1 was involved with Picca until April of 2017.[88] Agent Reite also explained that he had reviewed investigations of suspicious activity conducted by PayPal and Venmo (online payment platforms) which had determined that accounts belonging to Picca were completing transactions with minors which appeared to relate to "a collective of underage bodybuilders" receiving payments for "what they call private flex shows under the name Swole, Inc."[89] And, finally, Agent Reite included a number of online forum posts from early 2017 to early 2018 indicating the posters' belief that shows organized through Swole Inc. sometimes included "underage models . . . doing nudes if the price was right."[90]

This evidence suggests a continuous course of criminal conduct achieved exclusively through the use of a computer. The facts indicate that Picca was facilitating flex shows featuring nude underage models from approximately 2015 to at least early 2017. Such conduct is directly prohibited by 18 U.S.C. § 2251, which the warrant identified. Moreover, given the statements suggesting that Picca also observed shows involving underage male nudity, it was not unreasonable for the Magistrate to find probable cause of the child pornography offenses.

Finally, I note that the truly "historical" information in the warrant application, involving Mr. Picca's direct contact with young boys and suggesting

---

[88] *Id.*
[89] *Id.* ¶¶ 11-12.
[90] *Id.* ¶ 14.

that he may have pedophilic tendencies, does not contribute to my conclusion affirming the Magistrate's finding of probable cause. The Third Circuit has declined to take a clear stance on "the existence of a molestation-pornography correlation," instead advising that it "is a factual question."[91] Here, Agent Reite offered an extensive review of his understanding that "those who collect child pornography are more likely to be 'contact offenders' with children."[92] And that may be sufficient to establish the "molestation-pornography nexus."[93] But I need not decide the issue here, because the more direct and recent evidence in the affidavit reasonably supports a determination of probable cause to believe a crime had occurred.

## 2.    Probable Cause of Location

The second part of the *Gates* inquiry requires the warrant application to demonstrate probable cause "that contraband or evidence of the crime will be found in a particular place."[94] In the context of child pornography offenses, the Third Circuit has agreed with other Circuits "that evidence that the user of a computer employing a particular IP addressed possessed or transmitted child pornography can support a search warrant for the physical premises linked to that IP address."[95] The reasoning of this IP-address-basis for finding probable cause to search a related

---

[91] *Caesar*, 2 F.4th at 176-77.
[92] Doc. 69-3 at 25-26.
[93] *Caesar*, 2 F.4th at 177.
[94] *Gates*, 462 U.S. at 238.
[95] *Vosburgh*, 602 F.3d at 527-28 (citing *United States v. Perez*, 484 F.3d 735 (5th Cir. 2007)).

physical premises is not inherently limited to child pornography offenses.[96] Indeed, because "IP addresses are fairly 'unique' identifiers,"[97] "the connection between an IP address and a modem at an Internet subscriber's residence is sufficient to justify a search" if there is evidence that criminal activity has occurred via that internet connection.[98]

The warrant affidavit describes significant evidence connecting likely criminal activity to an IP address registered to subscriber "Dan Picca" living at "322 Amblewood Way."[99] Specifically, the IP address was associated with PayPal accounts registered to "danpicca@gmail.com" which made suspicious payments to accounts reasonably believed to belong to minors, including 23 payments of more than $100 to one of the minor witnesses.[100] The affidavit also explained that Picca owned a number of devices which had accessed the internet through the same IP address.[101] This information was more than sufficient to establish probable cause to believe that devices that had been used in the operation of Swole Inc. would be present at Picca's home, and possibly, given the portability of such devices, in his

---

[96] *See United States v. Tisdale*, 980 F.3d 1089, 1093-94 (6th Cir. 2020); *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008); *Attkisson v. Holder*, 925 F.3d 606, 637 (4th Cir. 2019) (Wynn, J., concurring in part and dissenting in part).

[97] *Vosburgh*, 602 F.3d at 527-28 (quoting *United States v. Forrester*, 512 F.3d 500, 510 n.5 (9th Cir. 2008)).

[98] *United States v. Featherly*, 846 F.3d 237, 240 (7th Cir. 2017) (citing, e.g., *Vosburg*, 602 F.3d at 527-28).

[99] Doc. 69-3 ¶ 22 (establishing ownership of the IP address).

[100] *Id.* ¶¶ 11-13 (noting that one of the payments was captioned as "5-min video for private sponsor (Swole Inc.)").

[101] *Id.* ¶ 23.

car.[102] And, given the previously noted retention of data on computers, there was similarly probable cause to believe that evidence of the identified crimes would be present on those devices.[103]

### 3. Overbreadth

Picca contends that the search warrant was overbroad because it authorized seizure of a list of items including "all items, records, files, and data relating to violations of 18 U.S.C. § 2251, 2252, and 2252A."[104] Specifically, the application requests permission to seize "[c]omputers or storage media used as a means to commit the violations described above," digital information on those computers including: "evidence of who used, owned, or controlled the computer" during the relevant period"; the frequency and timing of use; the presence of malicious software; efforts to hide criminal conduct on the computer; relevant passwords; internet history; and "contextual information necessary to understand the evidence described in this attachment," along with any "[r]outers, modems, and network equipment used to connect computers to the internet," "[c]ameras, video recorders,

---

[102] *See id.* ¶ 25.

[103] Picca fixates on the lack of evidence in the affidavit showing that he possessed actual child pornography, *see* Doc. 68 at 10 (challenging whether live shows were recorded); Doc. 98 (Suppl. Br.), but that argument entirely elides the affidavit's identification of 18 U.S.C. § 2251 as a suspected crime. Doc. 69-3 ¶¶ 2-3. That statute does not require that the defendant actually possess or produce child pornography. *See* 18 U.S.C. § 2251(a) (criminalizing "induc[ing] . . . any minor to engage in . . . any sexually explicit conduct . . . for the purpose of transmitting a live visual depiction of such conduct"). The affidavit establishes probable cause that evidence that Picca operated Swole Inc. as a means to transmit live streams in violation of Section 2251 would be found at Picca's home, and that is enough.

[104] Doc. 68 at 13; Doc. 69-3 at 37.

film, and any storage media for such cameras or recorders," "[i]tems, data, or records that assist in the identification of juveniles depicted in images or video files of child pornography," and any other "[r]ecords, information, and items relating to violations of the statutes described . . . including": records establishing occupancy of the residence and use of computer equipment found there; "correspondence and communications regarding the sexual exploitation of children or child pornography"; relevant "[t]ravel documents"; "correspondence to or from minor children"; or evidence of concealment.[105]

The Fourth Amendment's particularity requirement is intended "to prevent general exploratory searches."[106] An impermissible "general warrant authorizes 'a general, exploratory rummaging in a person's belongings.'"[107] In essence, it "vest[s] the executing officers with unbridled discretion to conduct an exploratory rummaging through defendant's papers in search of criminal evidence."[108] An overbroad warrant is one that "'describe[s] in both specific and inclusive generic terms what is to be seized,' but it authorizes the seizure of items as to which there is no probable cause."[109]

---

[105] Doc. 69-3 at 37-39.

[106] *United States v. Dewald*, 361 F. Supp. 3d 413, 416 (M.D. Pa. 2019) (citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).

[107] *$92,422.57*, 307 F.3d at 149 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

[108] *Id.* (quoting *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982)) (original alterations omitted).

[109] *Id.* (quoting *Christine*, 687 F.2d at 753-54); *United States v. Bowers*, 548 F. Supp. 3d 504, 508 (W.D. Pa. 2021) (citing *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006)).

Warrants authorizing a search of information on a computer may be cast in relatively broad terms.[110] And, when a crime involves digital transmissions or communications, it is appropriate for a warrant to permit search and seizure of any "computers . . . found in the home, including the hard drives."[111] Here, the warrant appropriately enumerated specific computers and storage devices that were likely to contain evidence of the listed crimes.[112] And the review of information on those devices was limited to specific evidence of the crimes, including communications with minors, and evidence about relevant usage, including potentially exculpatory information.[113] Other physical items to be seized included internet facilitating technology, cameras or recording devices, and materials directly related to the production or facilitation of the transmission of child pornography, in addition to evidence establishing that Picca was the sole or primary user of devices at the searched residence. These items were described with adequate particularity and were sufficiently related to the identified crimes.[114] The warrant does not authorize

---

[110] *United States v. Morgan*, 562 F. App'x 123, 128 (3d Cir. 2014).

[111] *Id.*

[112] *See $92,422.57*, 307 F.3d at 149 (approving warrant authorizing seizure of "[c]omputers, computer peripherals, . . . and software in order to conduct an off-site search for electronic copies of the items listed above"); *United States v. Karrer*, 460 F. App'x 157, 161 (3d Cir. 2012) ("[T]he warrant's authorization to search and seize virtually all computer-related items in Karrer's home does not invalidate the warrant.").

[113] *Karrer*, 460 F. App'x at 162-63.

[114] Specifically, the Court finds appropriate the inclusion of the travel and photography materials given a witness's statement that Picca asked him to travel to State College, Doc. 69-3 ¶ 16, and Swole Inc.'s ubiquitously described focus on photography and modeling of young men including minors.

general rummaging, but rather permits law enforcement to search and seize specific types of items with apparent relationships to alleged crimes. The warrant was neither impermissibly general nor overbroad.

### 4.    *Franks*

Picca argues that the warrant application contained two omissions rendering it misleading or untruthful. He challenges the affidavit's failure to: (1) describe a prior search of Picca's phone which uncovered no criminal conduct; and (2) "advise . . . that Swole Inc. was a legitimate bodybuilding/modeling agency."[115] Neither of these omissions is sufficient to entitle Picca to a *Franks* hearing, and they certainly do not warrant suppression.

"To obtain a *Franks* hearing, a defendant must establish (1) that a warrant application contained false statements made with reckless disregard for the truth and (2) that the remaining truthful statements, standing alone, do not establish probable cause."[116] Where an omission of exculpatory evidence is at issue,[117] the defendant must demonstrate that inclusion of the omitted material in the affidavit would undermine probable cause.[118] The defendant must make a "substantial preliminary showing" of these elements.[119]

---

[115] Doc. 68 at 15-16.
[116] *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (citing *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978)).
[117] *See Alburg v. Jones*, 784 F. Supp. 3d 775, 790 (E.D. Pa. 2025) (citing *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000))
[118] *United States v. Lampley*, 615 F. Supp. 3d 289, 294-95 (M.D. Pa. 2022).
[119] *United States v. Yusuf*, 461 U.S. 374, 383 (3d Cir. 2006) (quoting *Franks*, 438 U.S. at 171).

Including the alleged omissions would not alter the magistrate's reasonable finding of probable cause. As to the prior phone search, while it is true that exculpatory information must be included in a warrant application,[120] the fact that a prior search for similar material was fruitless does not negate probable cause for a later, more extensive search.[121] Stated simply, a search of limited scope that fails to provide evidence does not amount to a finding that the suspected criminal activity did not occur. And with regard to the legitimate activities of Swole Inc., it is well-established that "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."[122] It is entirely possible that Swole Inc. was used for both innocent and criminal conduct, so the fact that some activities on the platform were not criminal is simply not relevant to the probable cause determination. Because including the omissions would not defeat probable cause, there is no *Franks* violation nor any need to hold a *Franks* hearing.

---

[120] *Alburg*, 784 F. Supp. 3d at 790.

[121] *Spencer v. Roche*, 659 F.3d 142, 148 (1st Cir. 2011) (citing *United States v. Keszthelyi*, 308 F.3d 557 (6th Cir. 2002)); *United States v. Carlson*, No. 11-CR-0363, 2012 WL 836930, at *3 (D. Minn. Mar. 12, 2012) (explaining that failure of prior search "is irrelevant" to probable cause on subsequent search (citing *United States v. Blom*, 242 F.3d 799, 807 (8th Cir. 2001)); *United States v. McKerlie*, No. 10-CR-1783, 2011 WL 4345884, at *5 (D. Ariz. July 7, 2011).

[122] *United States v. Klump*, 536 F.3d 113, 120 (2d Cir. 2008) (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)); *see United States v. Scarfo*, 41 F.4th 136, 198 n.61 (3d Cir. 2022) ("[E]vidence of legal conduct does not negate the evidence of other, illegal conduct.").

### 5.    Good Faith Exception

The Government argues that, even if Picca is right about the supposed defects in the warrant, suppression of the evidence is not warranted under the good faith exception.

"Under the good-faith exception to the exclusionary rule, if an officer relies in good faith on a warrant later found to be deficient, evidence obtained pursuant to that warrant should be suppressed only if the officer had—or may be fairly charged with—knowledge of the deficiency."[123] An officer is not entitled to rely on a warrant when "(1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) the magistrate abandoned his judicial role and failed to perform his neutral and detached function; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized."[124]

Picca's arguments implicate situations (1), (3), and (4), but fail to move the ball on any of those points. The only alleged omissions are barely relevant to the probable cause issue, and their exclusion therefore falls far short of "deliberately and

---

[123] *United States v. Fallon*, 61 F.4th 95, 108 (3d Cir. 2023) (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).

[124] *United States v. Pavulak*, 700 F.3d 651, 663-64 (3d Cir. 2012) (quoting *United States v. Stearn*, 597 F.3d 540, 561 & n.19 (3d Cir. 2010)).

recklessly false."[125] I have determined that finding probable cause based on the affidavit was reasonable, so I cannot conclude in the same breath that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[126] And I have also decided that the warrant was not general or overbroad, so option 4 is off the table as well.[127] Even if those conclusions are wrong, my analyses demonstrate that each point is reasonably arguable, so Picca has not met the very high standard of showing that the officers' reliance on the warrant was unreasonable. Accordingly, the good faith exception precludes suppression.

### 6.    Delay Reviewing Seized Evidence

Picca contends that evidence recovered from his cell phone and computer should be suppressed because the Government unreasonably delayed in reviewing it. The Government explains that, although there was a long delay, it was the result of an effort to conduct a forensic review of materials that were password-protected.

A warrant that authorizes seizure of "electronic storage media or the seizure or copying of electronically stored information" also "authorizes a later review of the media or information consistent with the warrant."[128] Although the rule does not

---

[125]    *See Desu*, 23 F.4th at 236 (reasoning that omission of "immaterial" information was "not made with reckless disregard for the truth").
[126]    *See* Sections II.B.1-2, *supra*.
[127]    *See* Section II.B.3, *supra*.
[128]    Fed. R. Crim. P. 41(e)(1)(B).

specify a time limit for the "later review" to occur, courts have applied the Fourth Amendment "touchstone" of reasonableness to determine whether review occurred too long after execution of the warrant.[129] Courts have determined that extensive delays, ranging up to two years, can be reasonable when there are circumstances, such as the need to conduct a compartmentalized review or crack a password, which justify the passage of time.[130]

Here, Picca's motion focuses on evidence recovered from his cell phone, which was not reviewed for four-and-a-half years.[131] The Government explains that this delay was due to an extensive and ongoing effort break the password protection on these devices, and provides a comprehensive timeline detailing multiple years-long attempts to defeat the password between October 16, 2018, (immediately following the search) and September 26, 2022, (four years after the search). At the hearing, the Government offered extensive testimony from law enforcement and documentary exhibits establishing the chain of custody[132] and demonstrating that efforts to break the phone's encryption were ongoing over this period.[133]

---

[129] *United States v. Johnson*, 93 F.4th 605, 616 & n.12 (2d Cir. 2024); *United States v. Jarman*, 847 F.3d 259, 266-67 (5th Cir. 2017).

[130] *Jarman*, 847 F.3d at 266-67 (23-month search not unreasonable when Government had to avoid attorney-client privileged materials); *United States v. Shea*, No. 20-CR-412, 2022 WL 4298704, at *5-6 (S.D.N.Y. Sept. 19, 2022) (approximately two-year delay not unreasonable when device was password protected (collecting cases)); *United States v. Estime*, No. 19-CR-0711, 2020 WL 6075554, at *14-15 (S.D.N.Y. Oct. 14, 2020) (ten-month delay not unreasonable when cellphone was encrypted).

[131] Doc. 82 at 12-13.

[132] Gov't Ex. ("GX") 1.

[133] GX 2-4.

Specifically, the evidence established that the Philadelphia Regional Computer Forensics Laboratory ("RCFL") received the phone on October 16, 2018, and attempted but failed to decrypt it between November 6, 2018, and December 27, 2018.[134] RCFL made a second attempt throughout 2019, but that also failed.[135] The phone was returned to Agent Reite in January of 2020, and placed in storage.[136] But in May of 2020, Agent Reite retrieved the phone and sent it to Pennsylvania State Police Trooper Todd Roby the next month.[137] Trooper Roby offered to attempt to break the encryption, as he had helped to investigate the case before the warrant was executed.[138] Trooper Roby then ran several different encryption-breaking programs on the phone over the course of more than two years, until it was eventually unlocked on September 26, 2022.[139]

The Court finds that this review, while extremely lengthy, is not unreasonable.[140] The Government undertook more-or-less continuous efforts to break the encryption on Picca's phone. As technology progressed, it used different

---

[134] GX 2 at 3 (noting that "[a]ttempts to bypass the passcode during the listed processing dates were unsuccessful").

[135] GX 3 (stating that "[t]he examination was conducted between January 7, 2019 and December 17, 2019); *see* GX 4 (in-progress update).

[136] GX 1.

[137] GX 1; GX 5.

[138] *E.g.*, Doc. 93 at 15:17-24; 16:3-13; 42:3-24; 89:5-23.

[139] GX 6.

[140] *See United States v. Banwari*, No. 3:23-CR-0062, 2025 WL 35881 (W.D.N.C. Jan. 6, 2025) (finding 6-year delay caused by encryption-breaking efforts not unreasonable).

programs to achieve its goal, and had to perform hardware repairs multiple times.[141] Although the Government did leave the phone in storage for approximately five months in 2020, that pause in encryption-breaking does not show a lack of diligence, but rather a lack of ready options. As soon as Agent Reite was made aware of a new path to decryption, he transferred the phone to Trooper Roby and the unlock process began again. Because the delay was not unreasonable, there is no ground for suppression.

Picca's reliance on *United States v. Cawthorn* is misplaced.[142] In *Cawthorn*, Chief Judge James K. Bredar of the United States District Court for the District of Maryland suppressed evidence recovered from an Instagram account after a two-year delay in reviewing it.[143] But Judge Bredar specifically noted that "the Government d[id] not justify its delay," and the failure to offer any explanation for the delay played a significant role in his reasoning.[144] Here, the Government has offered an explanation—breaking a password—that has received widespread acceptance from reviewing courts.[145] Thus, *Cawthorn* is inapposite.

*    *    *

---

[141] *See* GX 6 at 2 (noting a screen replacement and four battery replacements, one of which resulted in a fire).
[142] 682 F. Supp. 3d 449, 458-59 (D. Md. 2023).
[143] *Id.*
[144] *Id.*
[145] *See, e.g.*, *Shea*, 2022 WL 4298704, at *5-6 (collecting cases).

Because all of Picca's bases for suppression are without merit, his motion to suppress is denied.

### C.    Modification

Picca contends that the electronic monitoring condition of pretrial release imposed upon him pursuant to 18 U.S.C. § 3142(c)(1)(B) is unconstitutional both facially and as applied.[146] Under the Adam Walsh Protection and Safety Act's amendments to the pretrial release statute, a defendant charged with an offense against a minor victim pursuant to 18 U.S.C. § 2425 must be subjected to a condition of electronic monitoring.[147] The imposition of this condition is mandatory under the statute.[148]

The mandatory pretrial release conditions imposed by the Adam Walsh Amendments have been the subject of extensive litigation. Two distinct lines of cases have developed to resolve constitutional challenges to the provision. One line holds that the mandatory conditions are unconstitutional, and applies a fact-specific approach to determine what conditions of pretrial release are appropriate under the familiar "least restrictive" standard of 18 U.S.C. § 3142(c)(1)(B).[149] The second line

---

[146] Picca also challenged the computer and phone monitoring condition, Doc. 64 at 9-14, but the Government consented to removal of the condition, Doc. 76 at 1 n.1, 15, and the Court granted that request after the Hearing. Doc. 94.

[147] 18 U.S.C. § 3142(c)(1)(B).

[148] *United States v. Crowell*, No. 06-CR-291E(F), 2006 WL 3541736, at *4 (W.D.N.Y. Dec. 7, 2006).

[149] *Id.*; *see, e.g.*, *United States v. Torres*, 566 F. Supp. 2d 591 (W.D. Tex. 2008); *United States v. Kennedy*, 593 F. Supp. 2d 1221 (W.D. Wash. 2008); *United States v. Rueb*, 612 F. Supp. 2d 1068 (D. Neb. 2009).

upholds the Adam Walsh Amendments, but reasons that, notwithstanding the mandatory language in the statute, the District Court should "exercise its discretion, to the extent practicable, in applying the mandatory release conditions."[150] Through different approaches, the cases converge in the same result: the Adam Walsh Amendments' mandatory conditions can be modified by the District Court to impose appropriate pretrial release conditions on the facts of a given case.[151]

Accordingly, I will modify the conditions of pretrial release to impose the least restrictive conditions necessary to ensure the safety of the community and to prevent flight.[152] Mr. Picca is currently on home detention and subject to electronic location monitoring.[153] Based on his compliance with his existing conditions of pretrial release, and the absence of evidence suggesting that he poses a flight risk or a danger of inflicting physical harm,[154] the Court finds that those conditions are too restrictive. Mr. Picca does not oppose a curfew restriction, and the Court finds one appropriate here. Finally, given Mr. Picca's history involving contact with young boys that several adjudicatory bodies found improper, the Court finds that a

---

[150] *United States v. Kennedy*, 327 F. App'x 706 (9th Cir. 2009) (unpublished); *United States v. Stephens*, 594 F.3d 1033, 1038 (8th Cir. 2010) (citing *Kennedy*, 327 F. App'x 706); *United States v. Cossey*, 637 F. Supp. 2d 881, 891 (D. Mont. 2009).

[151] *See United States v. Smedley*, 611 F. Supp. 2d 971, 974 (E.D. Mo. 2009) (applying constitutional avoidance to the extent possible before declaring the statute unconstitutional and imposing appropriate conditions of pretrial release).

[152] 18 U.S.C. § 3142(c)(1)(B).

[153] Doc. 11 (Conditions of Release).

[154] *See* Doc. 93 at 129:12-25.

condition of location monitoring would be appropriate. Mr. Picca's conditions of pretrial release are amended to reflect a curfew condition of 8:00 p.m. to 7:00 a.m. and GPS location monitoring.

### III.    CONCLUSION

For the above-stated reasons, Picca's motions to dismiss and to suppress are denied, and his motion to modify is granted.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge